In the Matter of a Plan for the Readjustment, Modification or Reorganization of the Rights of All the Holders of Mortgage Investments Represented by Series C-2 First Mortgage Participation Certificates Issued and Guaranteed by NEW YORK TITLE AND MORTGAGE COMPANY.

Supreme Court, Additional Special Term, New York County, December 29, 1936.

*Sherman S. Rogers,* for the trustees of series C-2.

*William A. Shea* [*Newton Millham* of counsel], for the Superintendent of Insurance, as liquidator of the New York Title and Mortgage Company.

*Thomas Keogh* [*Leon Leighton* of counsel], for David McAdam and others.

*Wagner, Quillinan & Rifkind* [*Simon H. Rifkind* of counsel], for prospective purchasers.

*Herman Gottlieb,* for the Mardel Investing Company, Inc., and others.

*James T. Tynion,* for the Neirbo Realty Corporation and others.

*Benjamin H. Trask,* for Mary M. Ward.

*Nathan E. Percy,* for Joseph E. Seigel.

*Charles H. Bellows,* for William Greenspan.

*Stephen W. Collins* [*Charles Glogower* of counsel], for E. N. Alroth.

*M. B. & D. W. Blumenthal* [*D. W. Blumenthal* of counsel], for the Independent Guarantee Mortgage Certificate Holders Protective Committee.

FRANKENTHALER, J. The trustees of series C-2, issued by the New York Title and Mortgage Company, have applied to the court, on notice to all certificate holders, for an order authorizing them

to complete and operate the building at 150 Central Park South, known as Hampshire House, unless a satisfactory offer for the purchase of the property be received on or before the hearing of the application.

The construction of Hampshire House, as an apartment hotel, was commenced early in 1931. Funds of the C-2 series aggregating $2,201,227.48 had been advanced by the New York Title and Mortgage Company by June, 1931, at which time building operations ceased because of lack of funds. Thereafter the building loan mortgage was foreclosed and title taken in the name of Liberdar Holding Corporation, a wholly owned subsidiary of the title company. The property was subsequently transferred to the Mortgage Commission Realty Corporation, a subsidiary of the Mortgage Commission, and was in turn conveyed to the C-2 trustees on May 25, 1936. Prior to the appointment of the trustees, an additional $252,376.46 of series C-2 funds was expended for taxes, insurance, payrolls and miscellaneous charges. The trustees have spent $22,275 for taxes for the second half of 1936, $3,800.31 for insurance, $2,641.86 for salaries and $2,406.97 for the cost of advertising this application, appraisal fees and miscellaneous expenses — a total of $31,124.14. By October first of this year the total investment of series C-2 in the premises was $2,484,728.08, which represents approximately ten per cent of the principal amount of the entire issue. In addition the title company had previously advanced *out of its own funds* the sum of $330,800.31, partly for the settlement of defenses to the foreclosure action interposed by the owner of the property and by mechanics' lienors, and partly for upkeep and other expenses. The total cost of the unfinished building to date is, therefore, $2,815,528.39, of which $2,484,728.08 was contributed from funds belonging to series C-2 ($2,453,603.94 prior to the appointment of the trustees and $31,124.14 since).

No construction work of any kind has been performed since June, 1931, five and a half years ago. The structure has thirty-six stories, inclusive of a penthouse, and is of fireproof steel. The building has been roofed over, but the tower has never been inclosed. All the pointing up work is still to be done. Radiators have been installed up to the thirty-fourth floor. The third to the twenty-fourth floors are in white plaster; the thirty-first to the thirty-fifth floors are in wire laths; no painting or flooring work has been done in any part of the premises; the floor of the main entrance hall is entirely unfinished with the steel exposed. There is no independent heating system, but the present steam lines have been so constructed that connection can be made with the pipes of the New York Steam Corporation. According to the architect

who drew the plans, the structure was about eighty-three per cent completed when further work was abandoned, but, because of subsequent depreciation and deterioration, is only approximately three-fourths complete at the present time.

Immediately upon their appointment in April, 1936, the trustees devoted themselves assiduously to the task of solving the difficult problem presented as to what to do about Hampshire House. In its incomplete state the property constituted, as it still does, a substantial drain upon the income received from other properties and mortgages belonging to series C-2. Real estate taxes, insurance, wages of custodians and other charges aggregate more than $50,000 per annum. What is more serious, the structure is rapidly depreciating in value by reason of its substantial deterioration in its unfinished, vacant and unheated state. It is safe to say that the property is costing the C-2 certificate holders well over $100,000 per year, directly and indirectly, without yielding any return whatsoever. Appreciating the necessity for a speedy solution of the matter, the trustees made a thorough inspection of the building and studied the entire situation with the assistance of the architect who prepared the original plans and other competent building and real estate men. They announced through the daily press that they were prepared to consider offers to purchase the property. They held approximately 150 conferences with interested brokers, clients of the latter, and among themselves in regard to tentative proposals for purchase or lease. The question of the approximate cost of completing the structure and the relative advantages of operating it as a hotel, an apartment hotel, or an apartment house, were discussed with leading people in the real estate field. As a result of their exhaustive investigation the trustees have been enabled to arrive at well-informed conclusions as to the most desirable use of the completed building, as to the approximate cost of completion, as to its value when completed, and as to its present value.

All this time the trustees were, however, making every effort to obtain offers to purchase the property in its unfinished state. They felt that completion should not be resorted to "until it appears that the property cannot be sold at a reasonable price." They "have been, and still are, reluctent to undertake completion of Hampshire House themselves if a sale at a fair figure can be effected." Up to the time of the making of the present application they have received numerous offers. Many of them, however, contemplated subordination of the certificate holders' interest in the property to a large mortgage for the cost of completing and furnishing the building, and were, therefore, rejected as unfair to the certificate holders. Others, ranging from $1,000,000 to $1,200,000 in

cash, were also received, but attempts to obtain a cash deposit to support and substantiate the offers were unsuccessful. Another offer of $1,500,000, one-half in cash and one-half to be secured by a ten-year mortgage subordinate to a building loan mortgage of not more than $1,500,000, was likewise given serious consideration by the trustees, but no cash deposit to back up the offer could be obtained.

As the result of their comprehensive and intensive study of the problem, the trustees have reached the conclusion that " a cash sale of the property would be the most desirable disposition of it, provided that a reasonable price can be obtained." This does not mean, however, that the trustees are insisting upon all cash offers. As previously stated, they gave serious consideration to an offer of $1,500,000, one-half in cash and the other half secured by a second mortgage, but no cash deposit was forthcoming. If the sale is to be entirely for cash, the trustees feel that a price less than $1,000,000 would constitute an unwarranted and unnecessary sacrifice of the certificate holders' investment. Having received no firm offer of a satisfactory amount, either all cash or only partly in cash, the trustees have asked the court for authority to complete and operate the structure " unless * * * a firm offer approved by. the Court and satisfactory to said Trustees for the purchase of the premises is received by said Trustees or submitted to the Court accompanied by cash or certified check in a sum representing 10% of such offer."

Hearings have been held upon notice to all C-2 certificate holders and every opportunity has been given to the certificate holders to express their respective views as to what should be done with Hampshire House. The testimony established conclusively that if the building is to be completed by the trustees, rather than sold in its present condition, it is most desirable and advantageous that it be constructed for use as an apartment hotel, and not as a hotel or as an apartment house. Expert evidence likewise established that the cost of finishing and furnishing the building as an apartment hotel would amount to approximately $1,500,000. Estimates as to the value of the structure when completed varied considerably, the most conservative expert testifying that the property on completion would be worth $3,000,000, while another real estate expert of high standing placed a valuation of $3,700,000 upon the finished structure. In arriving at a conclusion as to the value of the completed building, consideration was properly given (1) to the marked increase in the demand for space, particularly in apartment hotels, (2) to the upward trend of prices in which, real estate is already participating and in which it will ultimately participate to a much larger extent, (3) to the benefits reasonably

to be expected from the World's Fair to be held in this city in the near future, (4) to the excellent and valuable location of the property on Fifty-ninth street, opposite Central Park, (5) to the substantial revenues which are to be anticipated from the sale of liquor and food, and (6) to the fact that the building has been designed, in construction and comfort, to compete with the city's leading apartment hotels.

The value of the property *at the present time* is necessarily difficult to estimate, in view of its unfinished state and the consequent lack of a real market. Although it has been appraised as being worth $1,900,000 in its present condition, the appraiser has testified that in his opinion a very substantial deduction from that figure should be made for an offer of all cash. He stated that, in his judgment, if approximately $1,200,000 in cash could be obtained, it would be advisable to accept that figure rather than to complete the building. No offer even approximating $1,200,000, all cash or otherwise, has, however, been obtained by the trustees despite their strenuous efforts to secure bids for the property, except offers to about that figure which could not be regarded as reliable in view of the failure or inability of the offerers to furnish a reasonable cash deposit. The highest reliable cash offer which the trustees have received is $850,000, the offer having been increased from $800,000 since the hearing of the application. The lack of better offers appears to be due, not to the fact that the property is not worth more than $850,000, but rather to the difficulty of obtaining large mortgage loans from lending institutions under present conditions. The situation has been well described by counsel for the trustees: " A purchaser who pays $1,200,000 to the Trustees must necessarily raise at least another $1,500,000 in order to complete the building and furnish it. This necessitates a total investment of at least $2,700,000 for parties other than the Trustees. Since the lending institutions are not willing to lend much more than the present market value of the property, *i. e.,* $1,200,000, a prospective buyer finds himself in the position of having to supply at least $1,500,000 from his own funds, or in the form of a junior lien, and that is not possible under the present conditions." In view, however, of the expert testimony as to value and the number of persons who were ready to offer in the neighborhood of $1,200,000, except for their inability to obtain the requisite financing, the trustees have arrived at the conclusion that the property is worth about $1,200,000, and that acceptance of an offer of $850,000 would represent too great a sacrifice of the interests of the certificate holders to be justified.

Three courses are open to the trustees. One of them is to continue to hold the property in its present condition until substantially

higher offers of purchase are received. There is, however, no reasonable assurance that this will occur in the near future, particularly in view of the lack of a real market for unfinished buildings. Furthermore, holding the property in the hope that such offers may be received will impose a heavy continuing cost upon the series C-2 certificate holders. Real estate taxes, insurance and custodial charges must be paid as well as expenses for keeping the building heated in order to minimize deterioration as much as possible. Even if properly heated, it is the opinion of the architect who designed the structure that very serious deterioration will take place unless completion is commenced immediately. If the work of completion, which will take approximately eight months, is begun at once, the structure may be made ready for occupancy in time for the October, 1937, renting season. Any delay for the purpose of attempting to get larger offers will entail the loss of that opportunity and will cause heavy damage to the certificate holders, regardless of whether the building is ultimately completed by the trustees or by a purchaser. Any offers received will undoubtedly reflect the necessity of waiting for tenants until May and/or October, 1938.

The second course open to the trustees is to sell the property in its existing condition for the best price obtainable. Although an all cash offer is to be preferred, an otherwise satisfactory offer is not to be rejected merely because the entire price is not payable in cash. It is sufficient that the terms are such that payment of that portion of the price which is not represented by cash is reasonably well secured. No firm offers of a satisfactory amount, whether all cash or otherwise, have, however, been received by the trustees and they feel, very properly, that it would be wrong for them to dispose of the certificate holders' property at too great a sacrifice.

The trustees are, therefore, compelled to adopt the only remaining course open to them and that is to complete and operate the structure as an apartment hotel. They state that they have obtained assurances from an insurance company that it will lend them $1,300,000 at four and one-half per cent interest with amortization payments of two per cent yearly. With these funds and with an expenditure of about $200,000 in addition, the trustees, on the basis of the expert testimony adduced at the hearing, should be able to complete and furnish the building, *which would then have an equity which has been valued at no lower than $1,700,000, and which has been appraised as high as $2,400,000.* Realizing the difficulties and problems connected with the completion and operation of an apartment hotel and the fact that expert testimony as to future values is necessarily uncertain, and to an extent speculative, the trustees would much prefer to sell the property in its present unfinished

condition if they could obtain a price which would not represent too great a sacrifice to the certificate holders. Having failed, however, despite efforts over a period of almost three-quarters of a year to obtain an offer of such a price, they feel that they really have no option but to complete and operate the structure. They state: " In view of the fact that no purchaser has as yet come forward ready, able and willing to pay what the Trustees believe to be a fair market price for this property, they conclude that they must ask leave of this Court to complete the structure with borrowed funds. The Trustees have arrived at this conclusion somewhat reluctantly because, as stated above, they conceive it to be their duty to liquidate the assets in the trust estate as expeditiously as possible. Nevertheless, it is sometimes imperative that additional funds be risked in order to avoid ruinous liquidation. The Trustees believe that Hampshire House presents just such a problem and, consequently, they propose to go forward with the completion of the structure if this Court sees fit to grant their application." They propose to convey the title of Hampshire House to a separate corporation to be formed and controlled by them so that none of the other collateral securing the series C-2 certificates will be involved in the venture, and it is their purpose to employ a competent architect, a builder and a manager to work together with them from the very inception of operations. *They believe that they will have a much better chance of selling Hampshire House when it has been completed, on terms favorable to the certificate holders, than they have at present in its unfinished and vacant state and in the unfavorable condition of the mortgage market.*

These views of the trustees are apparently shared by the great majority of the certificate holders, for certificate holders owning only a very small percentage of the issue opposed the application. Although this court is as reluctant to authorize the trustees to complete an unfinished structure and operate it as the trustees themselves are to undertake such a task, the testimony at the hearings has convinced the court that there is no satisfactory alternative. If a price could be obtained for the property in its present condition which would even approximate the fair value of the premises, the court would be disposed to take the position that the trustees ought to sell rather than to build. The highest price obtainable up to the present time is, however, so far below the reasonable value of the premises that the court cannot conscientiously either authorize or recommend its acceptance. As a large majority of the certificate holders appear to be of the same opinion, the motion for authority to complete and operate Hampshire House and for incidental powers in connection with such authority is granted. Submit order.